IRVING, J.,
for the Court:
¶ 1. This action arises from a zoning-variance request that was filed by Memphis Stone and Gravel Company. Memphis Stone is currently leasing property in Panola County, Mississippi, and filed the variance request in order to expand its mining operation to property adjacent to its currently leased property. Scott and Mona Harrison, owners and residents of property located near the leased property, opposed the requested variance. The Batesville City Planning Commission recommended approval of the variance, and the Mayor and Board of Aldermen of the City of Batesville approved the variance, ■with certain restrictions. The Harrisons appealed to the Panola County Circuit Court, which affirmed the Mayor and *1170 Board of Aldermen’s order. Feeling aggrieved, the Harrisons appeal and assert that the variance constitutes impermissible spot zoning and that the variance was granted even though Memphis Stone failed to prove that it would suffer a substantial hardship if it was not granted the variance.
¶ 2. Finding that the variance constitutes impermissible spot zoning, we reverse and render the judgment of the circuit court, which affirmed the Mayor and Board of Aldermen’s grant of the variance.[1]
FACTS
¶ 3. The Harrisons own and reside on residential property located near sixty-five acres of property owned by Deborah and Timothy Haire, James Harvey, and Georgia, Billy, and Jane Seale. The sixty-five-acre tract is located in an R-l district (single-family residential) and a C-2 district (community business).[2] In May 2003, the Panola County Board of Supervisors granted Memphis Stone a special exception to operate Brassell Mine, a mining operation and wash plant.[3] Sometime thereafter, Memphis Stone sought to expand Brassell Mine and leased a sixty-five-acre tract north of Brassell Mine from the Haires and the Seales. The lease contains two separate parcels, and only eighteen of the sixty-five acres are within the city limits of Batesville. Batesville’s city code provides that mining or quarrying operations in R-l or C-2 districts are not allowed as a permitted or conditional use. Accordingly, on April 7, 2008, Memphis Stone filed a variance request with the City of Batesville seeking to “mine sand and gravel and convey material to [its] existing wash plant for processing” on the eighteen acres that fall within the city limits.[4] The Planning Commission voted unanimously to approve Memphis Stone’s variance request. Then, a public hearing was held wherein the Harrisons, among others, appeared as opponents to the request. The Mayor and the Board of Aldermen took the matter under advisement until its next meeting on July 1, 2008, when it voted to grant the variance. During a July 15, 2008, meeting of the Mayor and Board of Aldermen, one of the alder *1171 men made a motion to rescind the order granting the variance; however, that vote was defeated. Instead, the Mayor and Board of Aldermen voted to amend its grant of the variance to include several conditions.
¶ 4. As noted, the Harrisons appealed to the circuit court, which upheld the decision of the Mayor and Board of Aldermen. It is from that judgment that the Harrisons now appeal.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 5. In Perez v. Garden Isle Community Ass’n, 882 So.2d 217, 219 (¶ 6) (Miss.2004) (citing Broadacres Inc. v. City of Hattiesburg, 489 So.2d 501, 503 (Miss.1986)), our supreme court stated that “the standard of review in zoning cases is whether the action of the board or commission was arbitrary or capricious and whether it was supported by substantial evidence.” The Perez court also held that:
zoning decisions will not be set aside unless clearly shown to be arbitrary, capricious, discriminatory, illegal or without substantial evidentiary basis. There is a presumption of validity of a governing body’s enactment or amendment of a zoning ordinance and the burden of proof is on the party asserting its invalidity. Where the point at issue is “fairly debatable,” we will not disturb the zoning authority’s action.
Id. (quoting Carpenter v. City of Petal, 699 So.2d 928, 932 (¶ 13) (Miss.1997)).
¶ 6. The Harrisons contend that the variance should not have been granted because the variance results in impermissible spot zoning. “The term ‘spot zoning’ is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance and out of harmony therewith.” McKibben v. City of Jackson, 193 So.2d 741, 744 (Miss.1967). The Harrisons rely on Drews v. City of Hattiesburg, 904 So.2d 138 (Miss.2005) to support their position.
¶ 7. In Drews, Lee Medical Development, LLC bought six lots that were zoned as B-l, professional business district. Id. at 140 (¶ 3). At some point thereafter, Lee Medical filed for six variances with the City of Hattiesburg in order to build a 60,000-square-foot medical-office building. Id. The Hattiesburg Board of Adjustments granted four of the variances, and on appeal, the Hattiesburg City Council voted to grant all six of the variances. Id. at (¶ 4). Fred and Bonnie Drews, residents of the property in question, opposed the variance and appealed to the Forrest County Circuit Court, which affirmed the city council’s decision. Id. at (¶ 1). The Mississippi Supreme Court[5] held that:
the changes proposed in the six variances are so dramatic that they constitute a rezoning to B-3, two levels beyond the B-l (professional business district) lots in question. The differences between B-l and B-3 are so extreme that if the variances are granted, spot zoning would occur. The largest building that could [have been] ... built in B-l was 10,000 square feet. One of the granted variances would allow a single building on all the lots at a size of 60,000 square feet. The other variances included increasing the maximum allowed building height by 10 feet from 35 to 45 feet; reducing the number of parking places from 360 to 169; increasing the allowed percentage of *1172 “impervious surface” by 18% from 60% to 73%; reducing the minimum front “set back” from 25 feet to 10 feet; and allowing parking places in the front “set back” area.
Id. at 141-42 (¶ 10). The Drews court reversed, concluding that the variances constituted a rezoning “the effect of which is spot zoning.” Id. at 142 (¶ 12). The court also found as follows:
There is a clear[-]cut distinction between a validly enacted amendatory zoning ordinance and a “spot zoning” ordinance. Not all amendments which change or alter the character of a use district fall within the category of “spot zoning” as we generally understand the term. The term “spot zoning” is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance and out of harmony therewith. Whether such an amendment will be held void depends upon the circumstances of each case. The one constant in the cases, as stated by the textwriter, where zoning ordinances have been invalidated due to “spot zoning” is that they were designed “to favor” someone. See 1 Yokley Zoning Law and Practice §§ 8-1 to 8-3 (3rd ed.1965).
Id. at 141 n. 2 (emphasis added) (quoting McWaters v. City of Biloxi, 591 So.2d 824, 828 (Miss.1991)).
¶ 8. As to variances, the Drews court held that: “serious questions arise when a variance is granted to permit a use otherwise prohibited by the ordinance; e.g., a service station or quick-stop grocery in a residential district. The most obvious danger is that the variance will be utilized to by-pass procedural safeguards required for valid amendment.” Id. at (¶ 9) (quoting Robert C. Khayat & David L. Reynolds, Zoning Law in Mississippi 45 Miss. L.J. 365, 383 (1974)).
¶ 9. The circuit court, relying on this Court’s opinion in Cockrell v. Panola County Board of Supervisors, 950 So.2d 1086 (Miss.Ct.App.2007), held that granting the variance would not constitute spot zoning. The circuit court stated:
[The] record reflects that the City had before it evidence of a public need for a good source of local aggregate and that the project would be a good asset for the local community’s economy that will likely be lost to future residential and commercial development based on the location of the property, the location of the current “Brassell Mine” directly to the South of the “Seale-Haire” property, which contains a total of 65 acres, all of which [are] outside of the City of Bates-ville except the 18 acres at issue.
¶ 10. In Cockrell, we addressed the issue of spot zoning as follows:
The mere fact that an area is small and is zoned at the request of a single owner and is of greater benefit to him than to others does not make out a case of spot zoning if there is a public need for it or a compelling reason for it. 2 E.C. Yok-ley, Zoning Law and Practice § 13-5 (4th ed.1978). In this case, we have previously determined that the decision of the Board of Supervisors that “a public need existed for additional property to be zoned industrial so that additional employment could be created and to meet the public need of a place to dispose of metal products” is “fairly debatable” and will not be disturbed on appeal. See New Albany v. Ray, 417 So.2d [550,] 552-53 [ (Miss.1982) ]. Accordingly, we hold that while the rezoning may be of greater benefit to the Martins than to others, the fact that there is a public need for the rezoning, as found by the Board of Supervisors, *1173 protects the order from the claim of illegal spot zoning.
Id. at 1097 (¶ 28) (emphasis added).
¶ 11. We disagree with the circuit court and find that granting the variance constitutes spot zoning because it is clear that the variance favors Memphis Stone to the exclusion of other parties, as it will be able to expand its existing operation to the property that it is leasing from the Seales and the Haires. We also note that in accordance with the Batesville zoning ordinance, mining is not permitted or allowed on a conditional basis in either an R-l or C-2 district. Therefore, we find this to be a classic case of spot zoning. Notwithstanding that finding, we must now determine whether Memphis Stone proved that there was a public need or a compelling reason for the variance.
¶ 12. The circuit court found that “the City had before it evidence of a public need for a good source of local aggregate and that the project would be a good asset for the local community’s economy that will likely be lost to future residential and commercial development based on the location of the property.” There is nothing in the record to support this finding. Although Memphis Stone alleges in its operations narrative that “[t]he growth of Tate County demands a good source of local aggregate” and that “this deposit will be an asset to the local economy and will likely be lost to future residential development if not managed as a resource for construction material,” nothing in the record indicates that any evidence was presented to the Planning Commission showing a benefit to any entity other than Memphis Stone if its variance request were granted. There is nothing in the record to indicate that Memphis Stone is planning to provide the City with reduced-price aggregate or that the City will have any form of preference when Memphis Stone sells the aggregate that it has collected. On the contrary, the minutes of the Planning Commission’s meeting held on May 19, 2008, reflect only a benefit to Memphis Stone if the variance request were granted:
There next came on for consideration the variance request of Memphis Stone and Gravel, to have allowed the mining of sand and gravel in the R-l, Residential and C-2, Commercial Zones. Alan Parks of Memphis Stone and Gravel gave a presentation concerning the property being leased from the Haire Family and the Seale Family located on the west side of Hwy. 85, South. If the variance is allowed, the sand and gravel will be conveyored [sic] to the existing wash plant on Hwy. 35, South for processing.
¶ 13. We acknowledge that during the hearing before the circuit court, the City’s attorney said the following:
It’s the City’s position that a variance is ideal to allow Memphis Stone and Gravel to operate this mine temporarily for a two-and-a-half[-]year period that would provide the City with a good local source of aggregate with the infrastructure growing and to encourage infrastructure projects in the city, road work, things of that nature, those were considered by the City. And having this mine and having this aggregate as a source for the City was considered.
The City — just to go back through the facts. First of all, we are talking about ... a 65-acre lease that was granted to Memphis Stone and Gravel to expand their mining operation temporarily. The mining operation itself has been granted temporarily by the County, but 18 acres of those 65 acres are just across the municipal line in the city.
The Memphis Stone and Gravel, at that point, petitioned the City. They offered *1174 the — it is in the bill of exceptions — in the operations narrative they presented to the City Planning Commission or Zoning Commission, they explained that ten tons of aggregate each year needed for construction and maintenance, and that was considered by the City. They also explained that this land would be lost — you know, that the use of these minerals in this land would be lost to further use if developed. We are talking about 18 acres that was [sic] sitting there undeveloped, unused, with no plans of development which were included in this.
¶ 14. We find that the record lacks sufficient evidence to indicate that the issue of public need was fairly debated prior to approval of the variance request. Simply providing a summary account to the circuit court of what was presented to the Planning Commission is insufficient. Therefore, we conclude that the record does not suppoi't the finding that granting the variance to Memphis Stone would be an asset to the local economy. As such, we cannot say that the Planning Commission’s decision was supported by substantial evidence.
¶ 15. The Harrisons also argue that pursuant to the Batesville city ordinance, Memphis Stone was required to prove that it would suffer a substantial hardship if the variance were not granted and that Memphis Stone failed to do so. Section 1204(5) of the Batesville city ordinance states the following about applications to vary or modify zoning:
The board of appeals shall have the following powers, and it shall be its duty: To vary or modify the application of any of the regulations or provisions of the ordinance where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this ordinance, so that the spirit of this ordinance shall be observed, public welfare and safety secured and substantial justice done.
We agree that the record lacks evidence of any “practical difficulties or unnecessary hardship” that Memphis Stone would suffer if its variance request were not granted.
¶ 16. The dissent emphasizes the fact that the granted variance was only “temporary.” Regardless of the fact that the variance was technically granted for only two and a half years, it must meet the same standards as every other variance; whether the variance was granted unconditionally or for only two months, it must still not constitute spot zoning, or Memphis Stone must show a compelling reason or public need for the variance.
¶ 17. We have already concluded that granting Memphis Stone’s request for a variance would constitute spot zoning, as Memphis Stone will receive a greater benefit than any other person or entity and that Memphis Stone failed to show that the issue of public need was fairly debated by the Planning Commission before it voted to approve the variance request. Furthermore, Memphis Stone did not prove that it would suffer difficulties or hardship without the variance. Therefore, we reverse and render the judgment of the circuit court.
¶ 18. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE, P.J., GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J., AND BARNES, J.

. The original action involved the Harrisons and the Mayor and Board of Aldermen; however, Memphis Stone was allowed to intervene.

. Batesville’s city code states that residential districts are "designed and intended to secure for the persons who reside there a comfortable, healthy, safe, and pleasant environment in which to live, sheltered from incompatible ... and disruptive activities that properly belong in nonresidential districts.” On the other hand, the C-2 district is "designed to accommodate commercial development on a scale that is less intensive than that permitted in a C-l district. A lesser intensity of development is achieved through setback, heightf,] and minimum lot-size requirements that are more restrictive than those applicable to the C-l district. The types of uses permissible in these districts are generally similar to the types permissible in a C-l district, except that additional automobile-oriented businesses (e.g. drive-in banks and restaurants[) ] not allowed in the C-l district are permissible in these districts.... The C-2 [district] thus may provide transition in some areas between a C-1 district and a residential district or may provide for a smaller[-]scale shopping center [for] primarily one (1) neighborhood or area of the city (as opposed to a regional shopping center). The dimensional restrictions in the district are also designed in appropriate areas to encourage the renovation for commercial purposes of buildings that formerly were single[-]family residences.”

. Brassell Mine is outside of the Batesville city limits.

. The Batesville city code defines a variance as "[a] grant of permission by the board of adjustment that authorizes the recipient to do that which, according to the strict letter of this appendix, he could not otherwise legally do.”

. The case was initially heard by this Court, which held that the variances constituted spot zoning. The Mississippi Supreme Court subsequently granted the City of Hattiesburg’s petition for certiorari.